IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARON B. NORRIS, SR., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO.   21-cv-2524 |
| | : | |
| KILOLO KIJAKAZI,[1] | : | |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

**<u>MEMORANDUM OPINION</u>**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                May 25, 2023

Plaintiff Aaron B. Norris, Sr. brought this action seeking review of the Acting
Commissioner of Social Security Administration's decision denying his claim for Social Security
Disability Insurance (SSDI) under Title II of the Social Security Act, 42 U.S.C. §§ 401–433.
This matter is before me for disposition upon consent of the parties.  For the reasons set forth
below, Plaintiff's Request for Review (ECF No. 18) is **DENIED**.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed for SSDI, alleging disability since December 1, 2016, due to
stroke, arthritis, depression and hip and neck problems.  (R. 397).  Plaintiff's application was
denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge
(ALJ).  (R. 124, 157-58).  Plaintiff, represented by counsel, and a vocational expert testified at
the March 28, 2019, administrative hearing.  (R. 38-71).  On May 16, 2019, the ALJ issued a
decision unfavorable to Plaintiff.  (R. 125-46).  Plaintiff appealed the ALJ's decision, and on

---

[1]  Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been
substituted for Andrew Saul as the Defendant in this case.

June 1, 2020, the Appeals Council remanded the case for further evaluation.  (R. 147-51).  On October 7, 2020, a different ALJ conducted a supplemental hearing.  (R. 72-99).  On October 29, 2020, the ALJ issued another unfavorable decision.  (R. 7-32).  The Appeals Council denied Plaintiff's request for review on April 8, 2021, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-6).

On June 3, 2021, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C). (Compl., ECF No. 1; Consent Order, ECF No. 5).  On March 7, 2022, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 18).  The Commissioner filed a Response on June 6, 2022, and on August 29, 2022, Plaintiff filed a reply. (Resp., ECF No. 23; Reply, ECF No. 30).


## II.     FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on May 30, 1980, and was 36 years old on the alleged disability onset date.  (R. 285).  He graduated from high school.  (R. 217).  Plaintiff previously worked as a driver in car sales, a retail manager and in book publishing.  (R. 218).

### A.     Medical Evidence

#### 1.     Mental

On August 8, 2017, consultative examiner Brook Crichlow, Psy.D., recorded that Plaintiff has never been hospitalized for psychiatric reasons but that he planned to seek mental health treatment from Human Services.  (R. 585).  Plaintiff reported trouble sleeping, depressed moods, lack of motivation, irritability, argumentativeness, isolation, feelings of worthlessness,

excessive worry, forgetfulness and concentration problems.  (*Id.*).  Plaintiff's mental status examination results were generally normal except for exhibiting restless motor behavior, moderate anxiety, impaired recent and remote memory skills due to neurocognitive difficulties (based on Plaintiff's ability to recall only two of three objects after a delay), below average cognitive functioning, and fair insight and judgment.  (R. 587).  Dr. Crichlow diagnosed Plaintiff with unspecified neurocognitive, social anxiety and unspecified depressive disorders.  (R. 588). She listed Plaintiff's prognosis as "fair given his difficulties," but also noted that Plaintiff was in the "process of receiving mental health care."  (*Id.*).

In an attached Medical Source Statement, she indicated that Plaintiff's limitations were mild as to understanding, remembering and carrying out simple instructions, and making judgments on simple work-related decisions; moderate as to understanding, remembering and carrying out complex instructions, and interacting appropriately with the public and coworkers; and marked as to interacting appropriately with supervisors and responding appropriately to usual work situations and to changes in a routine work setting.  (R. 590-91).

On August 18, 2017, State agency consultant Roger Fretz, Ph.D., opined that Plaintiff had a mild limitation in his ability to interact with others and moderate limitations in his ability to understand, remember, or apply information; concentrate, persist or maintain pace; and adapt or manage himself.  (R. 116).

On August 28, 2017, Plaintiff presented for intake at Human Services.  (R. 780).  He reported anxiety, worsening depression, sleep and eating disturbances, rare panic attacks occurring around 2010 after his father died, passive suicidal thoughts without any plan or means, poor concentration and inattentiveness, and anger management problems.  (R. 780-81).  He reported seeking services because his aunt encouraged him and because he wanted "to feel better, find work and navigate if he needs to apply for disability."  (R. 784).

On December 11, 2017, Deepak Mahajan, M.D., at Human Services conducted a psychiatric assessment of Plaintiff.  (R. 774).  Plaintiff reported disturbed sleep due to hip pain resulting in the need for naps, decreased appetite (one meal per day), depression, mood changes, obsessive compulsive disorder symptoms (when counting money but not when cleaning), "hating" crowds and heights, delusions without feelings of persecution, and anxiety with palpitations, excessive sweating, tremors, chest pain and dizziness.  (R. 774-75).  His mental status examination revealed an anxious and dysphoric mood, tremors, cooperative but anxious manner and affect, logical and goal-directed thoughts, mild paranoia, poor short-term but good long-term memory, and fair judgment and insight.  (R. 775-76).  Dr. Mahajan diagnosed Major Depressive Disorder, Recurrent Episode, Moderate;[2] Panic Disorder; and Cerebellar Stroke Syndrome.  (R. 776-77).

However, Plaintiff did not continue with treatment at Human Services at that time because he lost his medical insurance.  (R. 767).  He therefore returned on March 13, 2018, for a new intake.  (*Id.*).  When asked why he wanted therapy, he responded that he "just want[ed] to get help in applying for disability."  (R. 772).  He was cooperative but showed a passive attitude and seemed uninterested in the process, despite reporting that he was not currently depressed.  (*Id.*).  He reported two panic attacks in the last two months, but his mental status examination was generally normal.  (R. 771-71).

Plaintiff returned to Human Services in April, August and September 2018 for medication review.  (R. 755-66).  At these visits, Plaintiff exhibited slow speech; an anxious, euthymic or depressed mood; a generally constricted affect (two of three visits); and a generally

---

[2]  Plaintiff cites a journal article indicating that his score of 20 on the PHQ-9 depression diagnosing tool administered by Dr. Mahajan corresponds with "severe" depression.  (Pl.'s Br., ECF No. 18, at 13).

cooperative attitude (two of three visits); and adequate social skills (two of three visits).  (*Id.*).  Plaintiff also reported decreased sleep at two of three visits.  (*Id.*).  Plaintiff reported panic attacks in crowds over this period, but also that they improved upon removing himself from the triggering situation.  (*Id.*).  Dr. Mahajan noted that Plaintiff improved at each visit, despite noting at the August 2018 one that Plaintiff did not appear compliant with his medication.  (R. 755, 759, 763).

### 2.    Physical

On October 23, 1997, Plaintiff suffered a stroke requiring a posterior fossa craniotomy for resection of an infarction after he "presented with a subacute history of headache progressing to coma with decerebrate posturing. CT scan done at Brandywine Hospital revealed what appeared to be a discrete infarction of the left cerebellar hemisphere with brain stem compression and acute hydrocephalus." (R. 787, 800).  Following surgery and sedation for 12 hours, Plaintiff, who had been brought nonresponsive to the emergency room by his mother, was alert and following commands.  (*Id.*).  He continued to improve but also demonstrated "some dysmetria and ataxia," respectively, the inability to judge distances and a lack of voluntary muscle control or coordination.  (*Id.*).  He had an otherwise "uneventful" hospital stay of five days before being discharged to neurological rehabilitation.  (R. 787-88).

On February 13, 2013, Plaintiff had surgery on his right hip for femoroacetabelar impingement and suspected chondral lesion and labral tear.  (R. 818).  Approximately six weeks later, Plaintiff was "doing well" with "minimal pain," and he was referred to physical therapy. (R. 824).

On February 22, 2017, plaintiff visited Brandywine Family Practice where he was treated by Dr. Daniel Selassie for dizziness, headaches, and bilateral hip pain.  (R. 495).  Dr. Selassie recorded hip pain increasing with flexion and rotation, as well as a tremor in Plaintiff's left hand

during use.  (R. 493).  Dr. Selassie provided Plaintiff with neurological and orthopedic referrals and prescribed Mobic and Percocet for pain.  (*Id.*).

On March 15, 2017, Plaintiff visited Dr. Ashley Anderson at Premier Orthopaedics and Sports Medicine for hip pain.  (R. 561-63).  He reported acute onset hip pain occurring for years but worsening, with "moderate to severe sharp stabbing [pain] (occasionally)," in both groins and the right buttock and posterior thigh, worse on the right side.  (R. 561).  The pain was brought on by nothing in particular, but was relieved with rest.  (*Id.*).  Other symptoms included neck and joint pain, tremors, anxiety, and fatigue.  (*Id.*).

On May 19, 2017, Plaintiff was evaluated by neurologist Roderick Spears, M.D. at Penn Specialty Care for headaches, which Plaintiff described as occipital, radiating from the neck to the right eye with gradual onset, pulsating, "9/10" in severity, lasting several hours, occurring twice weekly "but daily when he is working," triggered by heavy lifting and "walking a lot," alleviated by rest, and with associated photophobia, worsening tremors, lightheadedness and, rarely, nausea.  (R. 564).  Dr. Spears diagnosed cervicogenic headaches and injected Plaintiff with local anesthetics at the trigger points, resulting in "immediate relief of pain."  (R. 566).  He also prescribed indomethacin and directed Plaintiff to employ heat and stretching, all as needed. (R. 565-66).

On June 12, 2017, Plaintiff had an MRI of his head, which showed prior suboccipital surgery with left encephalomalacia, no mass lesions or abnormal enhancement, and rotational C1-C2 subluxation, possibly positional.  (R. 678).  One month later, Plaintiff had an MRI of his cervical spine, which showed: (1) a loss of normal disc signal intensity at each disc between C-2 and C-6; (2) at C-2 to C-3, a mild left-sided disc bulge and degenerative changes in the uncovertebral joints, worse on the left with minimal foraminal narrowing; (2) at C-3 to C-4, a diffuse disc bulge with right-sided foraminal disc protrusions, uncovertebral degenerative

changes and foraminal stenosis; (3) at C-4 to C-5, right disc bulge minimally impressing the ventral thecal sac, with mild degenerative changes in the uncovertebral joints; (4) at C-5 to C-6, a minimal disc bulge without canal or foraminal stenosis; and (5) normal C-6 to C-7 and C-7 to T-1 discs.  (R. 676-77).

On August 18, 2017, State agency consultant Chevaughn Daniel, M.D., opined that Plaintiff could lift and carry up to 10 pounds frequently and up to 25 occasionally, sit and stand and/or walk for six hours per workday, and occasionally perform all postural maneuvers.  (R. 117).  Dr. Daniel further determined that Plaintiff had no manipulative, visual, communicative or environmental limitations.  (R. 118).

On November 21, 2017, Plaintiff had an x-ray on his right hip, which showed no acute fracture but "mild further progression of the mild to moderate bilateral symmetric hip joint degenerative changes with joint space narrowing, mild marginal sparring, and superior acetabular sclerosis."  (R. 836).  The following month he had an MRI on his hips, which showed possible pincer-type femoroacetabular impingement (FAI), a detached labral tear and cartilage loss in his right hip and FAI with acetabular subchondral cystic changes in his left hip.  (R. 839-40).

On March 16, 2018, Plaintiff visited Dr. Selassie to follow up regarding his headaches and to have "disability paperwork" completed.  (R. 705-06).  Plaintiff reported twice weekly headaches and dizziness worsening with activity.  (R. 706).  He informed Dr. Selassie that he has been unable to work due to bilateral hip and left foot pain, headaches and dizziness.  (*Id.*).  He indicated that his foot and ankle pain worsen the longer he is on his feet.  (*Id.*).  Dr. Selassie's physical examination found numbness in both lower extremities "localized to lateral aspect of right thigh when compared to left thigh," with "no pain during flexion and internal rotation" but pain with "external rotation."  (R. 707).  He also found localized foot tenderness without

swelling.  (*Id.*).

On April 2, 2018, Plaintiff had an ultrasound on his left ankle, which showed mild tendinosis of the posterior tibial tendon and trace adjacent fluid, mild nonspecific tendon sheath fluid, and no prominent acute inflammation or tears.  (R. 843).  On April 27, 2018, Plaintiff underwent a left ankle arthroscopy and debridement and microfracture of an osteochondral lesion, debridement and grafting of a cyst, and injection of bone marrow aspirate concentrate. (R. 859).  A follow up x-ray showed post-surgical swelling but normal alignment.  (R. 712). Plaintiff was transitioned from a cast to a Controlled Ankle Movement boot and then an ankle support brace, and directed to do physical therapy.  (R. 733, 735).

On August 28, 2018, neurologist Brian Kelly, M.D., treated Plaintiff.  (R. 912).  Plaintiff reported to Dr. Kelly that due to his stroke he has worsening left-sided tremor and weakness, mild balance issues, and minor dizziness, as well as headaches, with no vomiting or vision loss but with mild photosensitivity, that sometimes include "purple clouds" in his vision that may or may not be associated with the headache.  (R. 914).  He stated that the headaches, which occur a few times per month, improve with rest.  (*Id.*).  He further reported that he had been prescribed indomethacin but that it provided no benefit, although imaging studies had shown "nothing significant."  (*Id.*).  In addition, he complained of chronic neck pain and claimed he required ankle surgery due to the effects on his gait, which resulted in ankle injury.  (*Id.*).

Dr. Kelly's physical exam showed "minor tenderness in the cervical paraspinal muscles," "subtle weakness of the left arm and left leg, but he is able to generate full strength," "a mild fixation of the left arm and arm rolling but no drifting," "a rapid tremor of the left arm with position and action, but no overt ataxia" and "no ataxia on heel-to-shin testing."  (*Id.*).  Dr. Kelly diagnosed "chronic hemi-ataxia as a result of cerebellar injury," intention tremor, headache and chronic neck pain and prescribed him propranolol to help with his tremor.  (*Id.*).  He noted that

Plaintiff's "chronic neck and head pain, likely associated with his surgery, . . . can be managed at a later date." (*Id.*).

Plaintiff returned to Dr. Kelly on September 12, 2018. (R. 912). Dr. Kelly noted that the propranolol provided no significant relief and was causing side effects, leading him to switch Plaintiff to primidone. (*Id.*). Physical examination results were largely the same as the prior month. (*Id.*). Plaintiff's gait was observed to be normal, and he had no finger-nose-finger or heel-to-shin ataxia. (*Id.*). Following a November 5, 2018 visit, Dr. Kelly noted: "Since discontinuing atenolol, he has had a recurrence of headaches, now occurring 2-3 times a week. They are of moderate intensity and resolved after 2-3 hours with Tylenol." (R. 909). He reviewed a 2017 MRI showing "encephalomalacia in the left cerebellum." (R. 910). Physical examination results were again largely consistent with prior ones. (R. 910). Dr. Kelly explained his treatment plan: "[T]he patient continues to have tremor as well as some mild dysmetria from his cerebellar stroke. I discussed treatment options with the patient, who has determined that he does not wish to increase his primidone to attempt to treat the tremor. He will discontinue the current dose. The patient does have headaches that were responsive to propranolol. He will resume this dose." (R. 910).

Plaintiff's final visit with Dr. Kelly occurred on February 5, 2019. (R. 906). Plaintiff reported a fainting instance lasting two minutes, in which he also felt hot, became diaphoretic and experienced some palpitations. (R. 907). However, he quickly reoriented, had no associated chest pain, shortness of breath, nausea, vomiting, incontinence, tongue biting or seizure activity, and refused to go to the emergency room. (*Id.*). He also reported instances of nearly fainting once or twice per week over the last two months. (*Id.*). Dr. Kelly recorded that Plaintiff's chronic left-sided tremor had "slowly improved over the years," but that propranolol had not helped significantly." (*Id.*). Plaintiff continued to report weekly severe headaches, without

nausea or vomiting, that did not respond to over-the-counter medications but that did respond to rest. (*Id.*).  Upon physical examination, Dr. Kelly noted: "There is a tremor of the left hand on outstretch. There is mild dysmetria on finger-nose-finger of the left arm. Sensations intact. He walks with a normal base and stride[,] limps on the left leg due to hip pain." (*Id.*).  Dr. Kelly discontinued Plaintiff's propranolol to see if it was contributing to the fainting and instead prescribed Fioricet "to be used when necessary." (*Id.*).

### B.    Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated May 10, 2017, Plaintiff reported suffering from migraine headaches resulting in dizziness and an inability to focus or concentrate, numbness and tremors in his left (dominant) hand making it difficult to write or perform other tasks because his hand is not steady, and extreme pain in his hip rendering him unable to lift and carry more than 10 pounds or walk, stand, bend, or squat. (R. 428).  He spends his days primarily laying in bed or on the couch, although he does leave his home to run errands.  (R. 429).  He has some difficulty with personal care, including dressing, bathing and shaving his head and face. (*Id.*).  He does laundry, sometimes prepares meals, shops in stores and online, manages money, watches television, plays computer games, socializes with family and friends, and rides as a passenger in automobiles but does not drive.  (R. 430-32).  He checked boxes on the form indicating difficulties with lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, memory, concentration and using his hands.  (R. 432). He explained that he can walk for five to 10 minutes before having to rest for five minutes.  (*Id.*). He follows spoken and written instructions "very well" and did not endorse any limitations on his ability to pay attention unless he is experiencing a migraine headache.  (*Id.*).  He has no problems with authority figures and handles changes in routine "somewhat well," but he becomes "depressed and introverted" with excessive stress.  (R. 434).  He does not use any

10

assistive devices.  (R. 434).  In an attached Supplement to the questionnaire, he stated that he has continuous searing and intensifying pain and pressure in his hip area that radiates to his lower back and leg while standing, walking, or lying down.  (R. 426).

Plaintiff's aunt, Robin Thomas, also completed a Third Party Adult Function Report dated May 24, 2017.  She noted Plaintiff's migraine headaches, hip pain, left hand tremors and weakness on his left side resulting in difficulty focusing, concentrating, standing, and sitting.  (R. 437).  She stated that Plaintiff takes care of his ten-year-old son after school until the boy's mother returns home but engages in few activities outside of the home.  (R. 438).  She indicated that Plaintiff has interrupted sleep habits due to his hip pain.  (*Id.*).  She generally repeated the list of daily activities provided by Plaintiff in his form.  (R. 438-41).  Ms. Thomas checked boxes indicating that Plaintiff has difficulty with lifting, standing, walking, kneeling, stair climbing, memory, concentration and using his hands.  (R. 442).  She affirmed that Plaintiff needs a few minutes to rest after walking, that he has no attention or concentration problems if not experiencing a migraine, that he follows written and spoken instructions "very well," and that he has no problems with authority figures.  (R. 442-43).  She further reported that Plaintiff handles stress and changes in routine "pretty well" and that he does not use any assistive devices.  (R. 443).

At the March 28, 2019 administrative hearing, Plaintiff testified that he lives in a two-story townhome with his son and his son's mother and that he uses the stairs two to three times daily, although it is painful for him to do so.  (R. 46, 59).  He has a driver's license but does not drive.  (R. 46-47).  He graduated high school.  (R. 59).  He stated that he suffered a stroke when he was 17 years old, which required brain surgery and left him with left-sided weakness.  (R. 47, 60).  He also complained of worsening left ankle weakness following a bad sprain.  (*Id.*).  He explained that he had right hip surgery in approximately 2010 and now has a left torn labrum for

11

which he is receiving cortisone shots pending surgery.  (R. 49, 54).  When asked why he could not perform a seated job like checking people in at a desk, Plaintiff responded that he had never done that before and did not know if he could or could not perform those functions.  (R. 50).  He indicated that he can walk 500 feet, that he has difficulty standing for more than 15 minutes, and that he has sharp pain in his buttocks while sitting due to the torn labrum.  (R. 51, 59).  He listed as his medications: baby aspirin for headaches; hydroxyzine for anxiety; meloxicam for inflammation; and omeprazole for heartburn.  (R. 52).  Plaintiff claimed to suffer two or more migraine headaches per week.  (*Id.*).  He noted prior left ankle surgery in 2018.  (R. 53).  He also received mental health counseling between 2017 and January 2019.  (R. 54).  His daily activities included watching television, microwaving meals because he never learned to cook, and using the telephone and social media.  (R. 58).  He exhibited his left-hand tremor and stated that it was "consistent" and unresponsive to treatment.  (R. 59).  He noted that he can interact with people but will not "go out of [his] way" to talk to them, which allegedly results in coworkers thinking he has a bad attitude.  (R. 60-61).

At the October 7, 2020 administrative hearing following remand by the Appeals Council, Plaintiff testified that he had moved out of the home shared with his son and his son's mother and into his girlfriend's home.  (R. 79).  He added that he was using an inhaler for sarcoidosis.  (R. 82).  He also indicated that he has memory loss and "purple dots" in his left eye and that he cannot focus on "tiny letters," which apparently impacts his ability to read a computer screen for more than five minutes, but his optometrist has not prescribed glasses.  (R. 83, 90).  He endorsed back, hip and joint pain.  (*Id.*).  He described the back pain as located at the L4-L5 disc and "eight" on a one-to-ten scale.  (R. 84).  He stated that his hip pain is bilateral and ranges between "seven" and "nine," but that his medical providers have told him that he is too young for hip replacements.  (R. 84, 91).  He explained that his joint pain is in his left ankle and a "seven."  (R.

85).  Plaintiff claimed that his tremor worsens with exertion.  (*Id.*).  He elaborated that the stroke he suffered at age 17 was the result of hitting the back of his head on concrete.  (R. 84).  He reported taking aspirin, Tylenol and medical marijuana and using an inhaler.  (R. 86).  He stated that he can drive during the day and short distances (under 30 miles) if he knows the area.  (R. 87).  He testified that he does not communicate well with others, that he suffers from depressive disorder and that he does not "do well" with crowds.  (R. 88).  He wakes up at 4:30 a.m. due to pain.  (R. 89).  He spends his days on the couch watching television and napping.  (R. 89-91).  When asked by the ALJ what most interferes with his ability to work, Plaintiff identified his anxiety and difficulty communicating.  (R. 91).

## III.   ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.  The claimant has not engaged in substantial gainful activity since December 1, 2016, the alleged onset date.

3.  The claimant has the following severe impairments: degenerative joint disease of the bilateral hips; osteoarthritis of the bilateral hips and left ankle; obesity; and anxiety disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that

claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except after standing and walking for 30 minutes, the claimant needs to sit and rest for one to two minutes, but can remain on task regardless.  The claimant can perform occasional stooping, crouching, kneeling, balancing, and climbing ropes and stairs, but he can never crawl or climb ladders, ropes, or scaffolds. The claimant can tolerate occasional exposure to extreme cold, wetness, and vibration, but no exposure to unprotected heights or unprotected moving mechanical parts. The work performed by the claimant would be at the low end of the stress spectrum, defined as having few if any changes in work schedule, duties, and location from day to day; and goal oriented, rather than production oriented, such that any production requirement can be accomplished by the end of the workday or shift. The claimant can have no contact with the general public and only occasional interactions with coworkers and supervisors.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born on May 30, 1980 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.      The claimant has at least a high school education.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security

Act, from December 1, 2016, through the date of this decision.

(R. 7-32).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 27).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that she cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If she is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits her physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform her past work.  If the
> claimant cannot perform her past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).


## V.   DISCUSSION

In his request for review, Plaintiff raises three claims:

> 1. The ALJ failed to properly evaluate the third-party evidence from the plaintiff's aunt.

> 2. The ALJ failed to adequately explain her evaluation of the psychological consultative examiner and her valuation of the non-examining state agency psychologist.

> 3. The ALJ failed to account for all limitations in the residual functional capacity assessment.  Specifically, the ALJ (a) failed to adequately include all limitations, severe and non-severe, in the RFC [residual functional capacity] formulation and (b) failed to properly evaluate the plaintiff's subjective testimony of pain.

(Pl.'s Br., ECF No. 18, at 5).

### A.   Third-Party Function Report

Regarding Ms. Thomas's Third-Party Function Report, the ALJ stated:

> The undersigned finds Ms. Thomas' statements to be partially persuasive. However, many of the limitations she identified are accommodated by the residual functional capacity. Ms. Thomas is

16

> not medically trained to make exacting observations as to the date, frequency, and degree of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms. Therefore, her statements are not fully persuasive because they are not supported by or consistent with the preponderance of the opinions and observations made by the medical providers in this case. In addition, she cannot be considered a disinterested third-party witness whose statements would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.

(R. 25).

Plaintiff argues that the ALJ's discounting of Ms. Thomas's report because she lacks medical training and is related to Plaintiff contradicts case law from within this circuit.  (Pl.'s Br., ECF No. 18, at 6-8 (citing *Dougherty v. Saul*, No. 3:20-CV-00504, 2021 WL 3077504, at *6 (M.D. Pa. July 21, 2021)); *Diaz v. Berryhill*, 388 F. Supp. 3d 382 (M.D. Pa. 2019)).  He also points out that the ALJ's assertion that "many" of Plaintiff's limitations identified by Ms. Thomas were accommodated in his residual functional capacity (RFC) necessarily implies that the remaining ones were not addressed.  (*Id.* at 8).  The Acting Commissioner responds that substantial evidence supports the ALJ's findings and denies that the ALJ discounted Ms. Thomas's statements solely on the basis on her familial relationship with Plaintiff.  (Resp., ECF No. 23, at 7).  She reiterates the ALJ's conclusions that Ms. Thomas's statements were unsupported by or inconsistent with the medical evidence and that "many" of Plaintiff's limitations set forth by Ms. Thomas were accommodated in the RFC.  (*Id.*).  Lastly, the Acting Commissioner asserts that any error in addressing Ms. Thomas's report was harmless because it was cumulative and would not have led to a different outcome  (*Id.* (citing *Crosby v. Barnhart*, 98 F. App'x 923, 923 (3d Cir. 2004); *Buffington v. Comm'r of Soc. Sec. Admn.*, No. 12-100, 2013 WL 796311, at *9 n.3 (D.N.J. Mar. 4, 2013); *Dougherty v. Colvin*, No. 13-289, 2014 WL 401205, at *7 (W.D. Pa. Aug. 18, 2014); *Butterfield v. Astrue*, No. 06-0603, 2011 WL 1740121, at *6 (E.D. Pa. May 5, 2011))).  Plaintiff replies that the Acting Commissioner's argument that

17

the result would have been the same even if the report had been properly considered is a speculative, *post hoc* rationalization and observes that the Appeals Council remanded the earlier decision for failure to properly consider Ms. Thomas's report.  (Reply, ECF No. 30, at 4-5).

Pursuant to 20 C.F.R. § 404.1529, a non-medical source's information about a claimant's pain or other symptoms, treatments and medications, and activities of daily living are "an important indicator of the intensity and persistence of [his or her] symptoms."  20 C.F.R. § 404.1529(c)(3).  Accordingly, the ALJ must consider "any symptom-related functional limitations and restrictions that [the claimant's] . . . nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ."  *Id.*  Further, under SSR 16-3p, "non-medical sources such as family and friends" may provide information from which the ALJ "may draw inferences and conclusions about an individual's statements that would be helpful . . . in assessing the intensity, persistence, and limiting effects of symptoms."  SSR 16-3p(2)(c), 2017 WL 5180304, at *7 (Oct. 25, 2017). Nonetheless, the failure to appropriately consider third-party lay opinion evidence is harmless where it is merely duplicative of the plaintiff's own statements or otherwise would not have changed the outcome.  *See Crosby*, 98 F. App'x at 926 (finding any error in rejecting claimant's fiancé's affidavit harmless where it merely "mirrored her own description" of her limitations); *Buffington*, 2013 WL 796311, at *9 (declining to remand case where the plaintiff's father's testimony was "largely cumulative of Plaintiff's own testimony, which the ALJ expressly found not credible"); *see also Dougherty*, 2014 WL 4101205, at *6 (refusing to remand where it was "evident that [non-medical source's] limited testimony would not have had an effect on the outcome of the case in light of the medical and opinion sources already in the record").

Plaintiff makes no attempt to distinguish these cases cited by the Acting Commissioner or to refute the assertion that Ms. Thomas's Third-Party Function Report largely duplicates

Plaintiff's own testimony.  Instead, he contends that the Acting Commissioner's position that even proper consideration of Ms. Thomas's report would not have altered the outcome is: (1) contrary to the Appeals Council's remand; (2) "probably" an improper *post hoc* justification, "[t]o the extent that it raises any arguments not advanced by the ALJ"; and (3) speculative. (Reply, ECF No. 30, at 4-5).  However, none of these contentions are compelling.  First, to the extent that the ALJ failed to apply 20 C.F.R. § 404.1529(c)(3) and SSR 16-3p, as directed by the Appeals Council, that would only establish that an error occurred, not that it was harmful.  *See Butterfield*, 2011 WL 1740121, at *6 ("courts have found that an ALJ's failure to address lay opinion testimony, although technically in violation of applicable legal standards, did not require remand since the testimony would not have changed the outcome of the case").  Second, Plaintiff's equivocal assertion that the Acting Commissioner's invocation of the harmless error doctrine *could* constitute an improper after-the-fact justification is unexplained and unsupported, and in any event the ALJ referenced the cumulative nature of Ms. Thomas's statement undergirding the finding of harmless error when she noted that the statement "tend[ed] to agree with the symptoms and limitations the claimant alleges."  (R. 25).  Third, there is nothing speculative about the conclusion that more complete consideration of Ms. Thomas's report agreeing with Plaintiff's testimony would not have altered the ALJ's ultimate decision where the ALJ already discounted that testimony.  (*See* R. 17 ("the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and the other evidence in the record")).

For these reasons, the Court denies the request to remand based on any error in the ALJ's consideration of Ms. Thomas's report.

### B.    Residual Functional Capacity Determination

Plaintiff's remaining arguments relate to the determination of his mental and physical

RFC.  RFC is "the most a [Plaintiff] can still do despite [his] limitations."  20 C.F.R. §§

404.1545(a)(1), 416.945(a)(1).  To determine the RFC, the ALJ must base the assessment on "all

of the relevant medical and other evidence."  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3);

*Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001).  That evidence includes medical records,

observations made during formal medical examinations, descriptions of limitations by the

claimant and others, and observations of the claimant's limitations by others.  *Id*.  The ALJ's

finding of residual functional capacity must "be accompanied by a clear and satisfactory

explication of the basis on which it rests."  *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir. 1981).

### 1.      Mental Residual Functional Capacity

The Commissioner modified Social Security's regulations in 2017, changing the way

ALJs evaluate medical evidence.  The prior regulations, which govern claims filed before March

27, 2017, divided medical sources into three categories:  treating, examining, and non-examining.

*See* 20 C.F.R. § 416.927(c).  ALJs were to weigh each medical opinion and could sometimes

afford controlling weight to opinions from treating sources. *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and

can no longer afford controlling weight to any opinion.  *See id.* § 416.920c(a).  Instead, ALJs

now evaluate the persuasiveness of each medical opinion and each prior administrative medical

finding.  *See id.*  Five factors determine persuasiveness:  (1) supportability; (2) consistency;

(3) relationship with the claimant, including length, purpose, and extent of the treatment

relationship, as well as frequency of examinations and whether the medical source examined the

claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical

source has familiarity with the other evidence in the claim or an understanding of our disability

program's policies and evidentiary requirements."  *Id.* § 416.920c(c). Supportability and

consistency are the most important factors.  *Id.* § 416.920c(b)(2).  ALJs must discuss

supportability and consistency but need not explain their determinations regarding the other factors.  *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* § 416.920c(c)(1).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 416.920c(c)(2).

Plaintiff contends that in determining his mental RFC the ALJ improperly evaluated the medical opinions of the state agency reviewer, Dr. Frets, and the psychological consultative examiner, Dr. Crichlow.  Specifically, he complains that the ALJ did not sufficiently explain the changes in her consideration of these opinions between her first and second decisions.  (Pl.'s Br., ECF No. 18, at 8, 15 (citing *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005)); Reply, ECF No. 30, at 6 (same)).  He accuses the ALJ of "playing doctor" and engineering a "result oriented" decision "to avoid having to consider that she was wrong the first time she decided the case . . . ."  (*Id.* at 14 (citations omitted); Reply, ECF No. 30, at 6).  He claims that 20 C.F.R. § 4l6.920c(b)(2), permitting an ALJ to discuss only supportability and consistency of a medical opinion, is contrary to the statute authorizing judicial review of Social Security appeals (42 U.S.C. § 405(g)) because it deprives the court of the ability to perform that function.  (Reply, ECF No. 30, at 6).  Plaintiff observes that, notwithstanding the changes in the regulations, courts have continued to require ALJs to articulate in detail how a medical opinion is purportedly inconsistent with the remainder of the record.  (Reply, ECF No. 30, at 6-7 (citations omitted)).

a.    **Dr. Frets**

In her initial decision, the ALJ addressed Dr. Frets's medical opinion as follows:

> On March 18, 2017, State agency psychological consultant, Roger
> Frets Ph.D. reviewed the record and opined that the claimant has a
> moderate limitation in understanding, remembering or applying
> information, concentrating, persisting or maintaining pace and in
> adapting or managing oneself (Exhibit 1A). He opined that the
> claimant has a mild limitation in interacting with others. He opined
> that the claimant would be capable of performing simple tasks. The
> undersigned finds this a little persuasive. The State agency
> psychological consultant neither examined nor treated the
> claimant. The evidence shows the claimant is more limited in his
> ability to interact with others due to his anxiety. Specifically, the
> record shows the claimant suffers from panic attacks and excessive
> worrying when around too many people (Exhibit 6F).

(R. 139).

In her subsequent decision, the ALJ addressed the opinion as follows:

> In August 2017, State Agency consultant Roger Fretz, [sic] Ph.D.
> reviewed the claimant's medical records in connection with this
> application for benefits. He identified diagnoses of depression,
> anxiety, and neurocognitive disorder. Dr. Fretz opined that the
> claimant has a mild limitation in his ability to interact with others,
> and moderate limitations in the three remaining domains of mental
> functioning (Exhibit 1A).
>
> This opinion is persuasive insomuch as the overall record reflects
> no more than moderate limitations in each of the four domains of
> mental functioning. However, as detailed above, the undersigned
> has identified moderate limitations in the claimant's ability to
> interact with others and concentrate, persist, or maintain pace. Dr.
> Fretz conducted a records review only, and did not have access to
> more recent evidence received at the hearing level, which shows,
> e.g., some anxiety present, but no indication of cognitive issues or
> serious concentration or memory problems. The claimant's
> depression was noted to be remitting (Exhibit 14F).

(R. 24).

Plaintiff accuses the ALJ of attempting to bolster her second decision by finding Dr.

Frets's opinion "more persuasive."  (Pl.'s Br., ECF No. 18, at 9).  However, a closer look at the

two decisions reveals that the ALJ did not, in fact, find Dr. Frets's opinion substantially more

22

persuasive the second time around.  In her first decision, she determined that the opinion's

persuasiveness was limited by her belief that the record demonstrated that Plaintiff was "*more*

*limited* in his ability to interact with others due to his anxiety" than Dr. Frets had concluded.  (R.

139 (rejecting Dr. Frets's conclusion that Plaintiff had only a mild rather than moderate

limitation in interacting with others) (emphasis added)).  In her second decision, the ALJ reached

essentially the same conclusion, albeit articulated somewhat differently, when she determined

that the opinion was "persuasive," but only "insomuch as" it was consistent with the record as a

whole "reflect[ing] no more than moderate limitations in each of the four domains of mental

functioning."  (R. 24).  In so noting the limitations on the persuasiveness of Dr. Frets's opinion,

the ALJ again observed that she had determined that Plaintiff was *more limited* (i.e., markedly

rather than mildly so) in his ability to interact with others than Dr. Frets had determined.  (R. 24).

Accordingly, Plaintiff's contention that in her second decision the ALJ improperly altered the

persuasiveness attributed to Dr. Frets's opinion is without merit.[3]

### b.   Dr. Crichlow

In her first decision, the ALJ addressed Dr. Crichlow's medical opinion as follows:

> On August 7, 2017, consultative psychological examiner, Brooke
> Crichlow, Psy.D. examined the claimant and opined that the
> claimant has a mild limitation in his ability to understand and
> remember simple instructions, carry out simple instructions and

---

[3]  Plaintiff's related contention that the ALJ improperly highlighted different evidence in
her second decision is also unavailing.  He complains that in the latter decision the ALJ omitted
mention of his panic attacks and excessive worry but added a reference to his depression being in
remission.  (Pl.'s Br., ECF No. 18, at 9).  However, in the second decision the ALJ noted that
Plaintiff suffered from anxiety, even if she did not specifically mention his panic attacks and
excessive worry.  (R. 24).  It was not error for the ALJ not to specifically mention Plaintiff's
panic attacks and excessive worry in her second decision any more than it was error for her not
to mention Plaintiff's remissive depression in her first decision.  *See Hur v. Barnhart*, 94 F.
App'x. 130, 133 (3d Cir. 2001) ("There is no requirement that the ALJ discuss in [her] opinion
every tidbit of evidence included in the record.").  As noted, the persuasiveness the ALJ
attributed to Dr. Frets's opinion did not substantially change in the subsequent decision, even if
her discussion of the evidence did not remain exactly the same.

make judgments on simple work-related decisions (Exhibit 6F). She opined the claimant has a moderate limitation in his ability to understand and remember complex instructions, carry out complex instructions and make judgments on complex work-related decisions. The undersigned finds this opinion persuasive because it is generally supported by and consistent with the substantial evidence of record.

(R. 139).

In her subsequent decision, the ALJ addressed the opinion as follows:

Lastly, in August 2017, the consultative examiner assessed the claimant with cognitive dysfunction (Exhibit 6F). However, this was based on a brief, one-time encounter with the claimant, with limited opportunity for record review. The claimant's treating providers—including his neurology and mental health providers—made no such diagnosis. Instead, aside from mild memory and concentration issues, there is no evidence to suggest that the claimant suffers from cognitive dysfunction. As this condition has not been demonstrated by medically acceptable clinical diagnostic techniques, the undersigned finds it to [be] non-medically determinable.

. . . .

In August 2017, subsequent to the mental consultative examination, Dr. Crichlow completed a medical source statement. She assessed the claimant with unspecified neurocognitive disorder, social anxiety disorder, and unspecified depressive disorder. Dr. Crichlow identified mild limitations in the claimant's ability to understand, remember, and carry out simple instructions, and to make judgments on simple work-related decisions. She found moderate limitations in his ability to understand, remember, and carry out complex instructions, and to make judgements on complex work-related decisions. Dr. Crichlow cited the claimant's history of head injury, stroke, focusing difficulties, memory loss, and fatigue. She further found moderate limitations in his ability to interact appropriate[ly] with the public and coworkers, and marked limitations in his ability to interact with supervisors and respond appropriately to work situations and to changes in a routine work setting. Dr. Crichlow cited the claimant's chronic depression, limited motivation, cognitive difficulties, anxiety in social settings, and excessive worry (Exhibit 6F).

This opinion is persuasive insomuch as the record supports and is consistent with no more than mild to moderate limitations in the claimant's ability to understand, remember, and carry out

> instructions. However, there is little evidence to support Dr. Crichlow's assessment of marked limitations in the claimant's ability to interact appropriately with supervisors or respond appropriately to usual work situations and to changes in a routine work setting. Dr. Crichlow based her assessment on a one-time encounter with the claimant, with significant deference to his subjective reports and limited opportunity for record review. During her own evaluation of the claimant, he exhibited anxiety, but was cooperative, made appropriate eye contact, and had normal speech (Exhibit 6F). Mental health records received subsequent to Dr. Crichlow's review almost consistently showed cooperative behavior and adequate social skills. The undersigned finds that the claimant has no more than moderate limitation on social functioning.

(R. 13, 23-24).

Plaintiff highlights the ALJ's observation in her second decision that Dr. Crichlow had only "a brief, one-time encounter" with him, with limited opportunity for record review but with "significant deference to his subjective reports," and counters that she nonetheless tested his recent and remote memory and found them to be impaired, thus forming an observational basis for her opinion. (Pl.'s Br., ECF No. 18, at 10-11 (quoting R. 13, 24)). In addition to recounting much of his mental health treatment history, Plaintiff also claims that the ALJ wrongfully assumed that he has "no problems" with social skills and only moderate limitations on social functioning based on two references to adequate social functioning and one stating that it was inadequate. (*Id.* at 11-14). He submits that the ALJ should have developed the record further but instead "played doctor" in order to again reach an unfavorable decision. (*Id.* at 14).

But the ALJ's second decision is more nuanced and supported than Plaintiff suggests. Initially, nowhere in the second (or first) decision did the ALJ find that Plaintiff has "no problems with social skills," as Plaintiff argues in his brief. (Pl.'s Br., ECF No. 18, at 13-14). Instead, the ALJ accepted Dr. Crichlow's conclusion that Plaintiff has moderate limitations in interacting with the public and coworkers and only rejected her conclusion that Plaintiff has marked limitations in interacting with supervisors and responding appropriately to usual work

situations and changes in work routine.  (R. 24).  Moreover, the ALJ's partial rejection of Dr. Crichlow's opinion rests upon more than the reasons cited by Plaintiff.  The ALJ additionally observed that Dr. Crichlow's opinion that Plaintiff suffered from marked limitations was not supported by or consistent with the record evidence as a whole.  This evidence included his "limited" and "brief and conservative" mental health treatment, consisting of no treatment before 2017 or after September 2018, as well as a March 2018 admission that he was seeking mental treatment because he believed it would assist him to obtain disability benefits.  (R. 23 (citing R. 755-86)); *see also Morales v. Comm'r of Soc. Sec.*, 799 F. App'x 672, 676-77 (11th Cir. 2020) ("A conservative treatment plan tends to negate a claim of disability . . . .").  The ALJ further noted that Plaintiff's depression was in partial remission, that he reported few specific panic attacks, and that, in any event, following treatment Plaintiff learned that removing himself from the situation helped his panic attacks.  (R. 23 (citing R. 755-86)).  She additionally observed that Plaintiff has almost uniformly cooperated with mental health treatment providers, including Dr. Crichlow herself, and that he also made appropriate eye contact and spoke normally during her examination.  (R. 24).  Accordingly, the ALJ's decision regarding Dr. Crichlow's opinion is supported by more than a "scintilla" of evidence and, as such, will not be disturbed.  *See Burnett*, 220 F.3d at 118.

## 2.      Physical Residual Functional Capacity

After recounting his physical health history, Plaintiff alleges two prejudicial errors in the ALJ's determination of his physical RFC: (1) that the ALJ failed to properly account for several non-severe impairments; and (2) that the ALJ did not give proper weight to his subjective complaints.  (Pl.'s Br., ECF No. 18, at 23-29; Reply, ECF No. 30, at 8-9).  The Court considers these arguments in turn.

### a.   Plaintiff's Non-Severe Impairments

An ALJ must consider all a claimant's medically determinable impairments in assessing a claimant's RFC, including impairments that are not severe.  20 C.F.R. § 404.1545.  "Functional limitations caused by all impairments, whether found to be severe or non-severe at step two, must be taken into consideration at steps three, four and five of the sequential evaluation." *Brown v. Astrue*, No. 09–3797, 2010 WL 4455825, at *4 (E.D. Pa. Nov. 4, 2010).  However, if a limitation is minimal or negligible, it is not error to omit the limitation from the RFC assessment. *See Ramirez v. Barnhart*, 372 F.3d 546, 555 (3d Cir. 2004); *Stewart v. Astrue*, No. 11-1338, 2012 WL 1969318, at *19-20 (E.D. Pa. May 31, 2012) (finding ALJ's failure to include a specific reference to claimant's mild limitations in his RFC assessment reflected ALJ's determination that the impairments were "so minimal or negligible" that they would not significantly limit claimant's ability to perform work).

Here, Plaintiff contends that the ALJ failed to account for two non-severe impairments in his physical RFC, a left (dominant) hand "intention tremor"[4] and headache disorder.  Regarding these impairments, the ALJ wrote:

> In addition to the severe impairments listed above, the record refers to the following nonsevere impairments: . . . left hand tremor (chronic, but improved since the time of his stroke); and headache disorder (conservative treatment including Fioricet prescribed as needed, but little additional treatment or significant complaints) (Exhibit 1F; Exhibit 11F; Exhibit 18F). The undersigned finds that these impairments cause no more than mild limitation to the claimant's ability to perform basic work tasks, and are therefore nonsevere. The undersigned considered all of the claimant's medically determinable impairments, including those that are not

---

[4]  Plaintiff explains: "Intention tremor is produced with purposeful movement toward a target, such as lifting a finger to touch the nose. Typically the tremor will become worse as an individual gets closer to their target."  (Pl.'s Br., ECF No. 18, at 25 (citing National Institute of Neurological Disorders and Stroke, *Tremor Fact Sheet*, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Tremor-Fact-Sheet)).

severe, when assessing the claimant's residual functional capacity.

(R. 13).

### i.       Left Hand Intention Tremor

Plaintiff submits that "[i]t is hard to understand what evidence the ALJ relied upon to find that the chronic tremors would not cause more than a minor impairment in the plaintiff's ability to work."  (Pl.'s Br., ECF No. 18, at 25).  He acknowledges that Dr. Selassie observed that the tremor has improved since his stroke, but he discounts this observation because Dr. Selassie has continued to treat the tremor without success and because the record provides "no quantification" of the extent of the improvement.  (*Id.*).  He insists that the tremor "is still clearly a problem."  (*Id.*).  He points out that his RFC providing for sedentary work does not contain a limitation on reaching and handling even though "most sedentary jobs require good use of the hands and fingers."  (*Id.* at 26 (quoting SSR 83-14, 1983 WL 31254 (Jan. 1, 1983))).  Also quoting SSR 85-15, he notes that "[s]ignificant limitations on reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do" and that "loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does" the ranges for higher exertional levels.  (*Id.* (quoting SSR 85-15, 1985 WL 56857 (Jan. 1, 1985)) (Plaintiff's emphasis omitted)).  In Plaintiff's view, the purported failure of the ALJ to account for his tremor in the RFC renders it "inaccurate and unsupportable."  (*Id.*).

Contrary to Plaintiff's assertions, his tremor does not present any restrictions not accounted for in the RFC.  As the ALJ referenced, although the tremor is "chronic," Dr. Selassie also found that it "has slowly improved over the years."  (R. 13 (citing R. 907)).  Plaintiff complains that the "quantification" of improvement is unknown from the record, but the absence of any such evidence is not a basis to overturn the ALJ's decision, particularly where Dr. Selassie further noted that the dysmetria associated with the tremor is only "mild" and that there

was no overt ataxia.  (R. 907, 914).  Plaintiff posits that his tremor "probably" worsens as his

hand nears the object he is attempting to touch, but he cites no evidence for this supposition,

which instead appears based only on what "typically" occurs with intention tremors according to

the website he cites.  (Pl.'s Br., ECF No. 18, at 26).  In short, Plaintiff fails to point to evidence

that he lacks even "good" use of his left hand or that he is "significantly" limited in his ability to

reach or handle with it, such that the concerns raised by the cited Social Security Rulings

regarding the potential impact on available jobs would be implicated.  *See* SSR 83-14; SSR 85-

15.  Finding that the ALJ's determination that Plaintiff's left hand tremor requires no additional

restrictions in the RFC rests upon substantial evidence, the Court declines to remand on the

proffered basis.

### ii.       Headache Disorder

Plaintiff similarly claims that his physical RFC does not account for his headache

disorder.  (Pl.'s Br., ECF No. 18, at 27-28).  He argues that his headaches are chronic and have

not responded well to treatment but that the ALJ nonetheless determined that they were not

severe because he received only "conservative" treatment, even though no medical opinion

described it as such and the ALJ did not specify what treatment would have been less

conservative.  (*Id.* at 27).  He notes that his treatment included injections and, starting shortly

before his second hearing, Fioricet, a controlled substance barbiturate/acetaminophen

combination.  (*Id.*).  He cites cases stating that a claimant's reports of pain cannot be discounted

"solely because the claimant received 'conservative' treatment" and that the severity of a

physical impairment may not directly correlate with the intrusiveness of the appropriate

treatment.  (*Id.* (citations omitted)).

However, the nature and extent of Plaintiff's treatment was not the sole reason that the

ALJ determined that his headache disorder required no additional restrictions in the RFC.  She

also determined that the record showed few "significant complaints." (R. 13).  This

determination is backed by substantial evidence.  In August 2018, Plaintiff reported "headaches a

few times a month that will improve with rest." (R. 914).  He denied associated vomiting or

acute visual loss, although he did experience "minor" photosensitivity and occasional "purple

clouds" over his vision "that may be associate[d] with headache or not." (*Id.*).  The following

month he reported that he was not experiencing any headaches. (R. 912).  By November 2018,

Plaintiff's headaches had returned, occurring two to three times per week, after he discontinued

atenolol, but the headaches were of "moderate" intensity with no vomiting and resolved with

Tylenol. (R. 909).  At the February 2019 visit, Plaintiff reported experiencing "episodic"

headaches, "about once a week." (R. 907).  They had worsened but resolved with rest. (*Id.*).

Dr. Kelly discontinued Plaintiff's propranolol because of side effects but started Plaintiff on

Fioricet "when necessary." (*Id.*).  Because this evidence is such that "a reasonable mind might

accept as adequate" the ALJ's determination that Plaintiff's headaches were non-severe and did

not warrant further restrictions in his RFC, the Court denies Plaintiff's request to remand on this

point. *See Burnett*, 220 F.3d at 118.

**b.    Subjective Complaints of Pain**

Under Social Security Ruling 16-3p, the ALJ must follow a two-step process in

evaluating the Plaintiff's subjective symptoms: (1) determine if there is an underlying medically

determinable physical or mental impairment, shown by medically acceptable clinical and

laboratory diagnostic techniques, that could reasonably be expected to produce the Plaintiff's

pain or symptoms; then (2) evaluate the intensity, persistence, and limiting effects of the

symptoms to determine the extent to which they limit the Plaintiff's functioning.  SSR 16-3p,

2016 WL 1119029, at *4-8 (Mar. 16, 2016).  In evaluating the intensity, persistence, and limiting

effects of a claimant's symptoms, the ALJ must consider relevant factors such as the objective

medical evidence, evidence from medical sources, treatment course and effectiveness, daily activities, and consistency of Plaintiff's statements with the other evidence of record. *Id.*

It is within the province of the ALJ to evaluate the credibility of a claimant. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). "Although 'any statements of the individual concerning [his] symptoms must be carefully considered,' the ALJ is not required to credit them." *Chandler*, 667 F.3d at 363 (citing SSR 96–7p and 20 C.F.R. § 404.1529(a)). An ALJ's "findings on the credibility of [a] claimant [] 'are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" *Irelan v. Barnhart*, 243 F. Supp. 2d 268, 284 (E.D. Pa. 2003) (citation omitted). An ALJ may disregard a claimant's subjective complaints when contrary evidence exists in the record. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). However, the ALJ must provide his reasons for discounting a claimant's testimony. *Burnett*, 220 F.3d at 122; *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

In this case, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. 17). However, she also concluded that the subjective evidence "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*). Plaintiff dismisses this statement as meaningless "boilerplate" and claims that the ALJ failed to identify the inconsistent evidence, thus requiring her to give Plaintiff's subjective complaints "great weight." (Pl.'s Br., ECF No. 18, at 29 (citations omitted)).

Contrary to Plaintiff's contentions, throughout her decision the ALJ repeatedly highlighted record evidence inconsistent with Plaintiff's reports of disabling pain. Regarding Plaintiff's hip pain, this evidence included 2012 hip surgery that "produced good results, both

radiographically and per the claimant, who subsequently exhibited minimal pain." (R. 18 (citing R. 593-652, 818-29)). The ALJ acknowledged that ten months later Plaintiff was experiencing "some discomfort," but he also reported a 60 to 70 percent improvement in pain as compared to before the surgery. (*Id.* (citing R. 818-29)). By March 2017, Plaintiff's hip pain had worsened, and it has persisted throughout the disability period, at least with some movements if not with others. (R. 18 (citing R. 556-63, 682-701, 702-31 (noting "hip pain with internal rotation, but none with flexion or external rotation"), 904-29); *see also id.* (citing R. 732-51 (noting "some joint hip pain due to the boot" Plaintiff was wearing following ankle surgery))). However, Plaintiff's contention that the ALJ simply ignored the subjective evidence of his hip pain is without basis. On the contrary, the ALJ specifically identified his hip pain as one of the reasons that he was restricted to sedentary work with additional postural limitations, such as only occasional stooping, crouching, kneeling, balancing, and climbing ramps and stairs and never crawling or climbing ladders, ropes, or scaffolds. (R. 16, 25).

The ALJ also noted that following reports of foot and ankle pain Plaintiff had left ankle surgery in late April 2018. (R. 19 (citing (R. 803-903))). Post-operatively he had "normal alignment" in his left lower extremity and generally "progressed well," transitioning from a cast to a boot to a brace with a prescription for physical therapy. (*Id.* (citing R. 702-51)). An x-ray of his ankle later that year "showed no acute findings." (*Id.* (citing 904-29)). Again, however, the ALJ accounted for any ongoing ankle pain in restricting Plaintiff to sedentary work with additional postural limitation due to, *inter alia*, his "lower extremity issues." (R. 25).

Regarding any neck and back pain, the ALJ noted Plaintiff's 2017 MRI showing multilevel degenerative disc changes and other issues, as well as March 2018 complaints of "bilateral low back pain with rare radiation down his legs." (R. 18-19 (citing R. 671-731)). However, as the ALJ also noted, a physical examination at that time showed "no tenderness or

muscle spasm" in his back, and an October 18 x-ray showed no fracture or malalignment of the lumbar spine.  (R. 19 (citing R. 702-31, 890-903)).  Nonetheless, as with Plaintiff's hip, foot and ankle pain, any pain related to Plaintiff's spine was explicitly accommodated in the RFC limited to sedentary work with various postural limitations.  (R. 25 (citing issues with Plaintiff's spine as one reason for the exertional and postural limitations in the RFC)).

Accordingly, although Plaintiff does not specify the subjective evidence of pain allegedly overlooked by the ALJ, the decision reflects that she appropriately relied upon record evidence to discount his statements regarding the intensity, persistence and limiting effects of his pain. Thus, the Court denies Plaintiff's request to remand on this basis.

**VI.    CONCLUSION**

For the reasons set forth above, Plaintiff's request for review is **DENIED**.  An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge